IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**THEODORE VICKERS**,

        Plaintiff,

    v.

**OFFICER J. JENSRUD, UNITED STATES OF AMERICA, and JOHN DOES 1 through 20**,

        Defendants.

No. 3:12-cv-02102-MO

OPINION AND ORDER

**MOSMAN, J.**,

    In this action, Plaintiff Theodore Vickers asserts claims under the Federal Tort Claims Act ("FTCA") and the Eighth Amendment arising from injuries he sustained when a fellow inmate attacked him. (2d Am. Compl. [23] at ¶¶ 32–47.) Defendants Officer J. Jensrud, the United States, and twenty Does moved [27] to dismiss. I granted the motion as to the FTCA claim under the discretionary function exception. (Op. & Order [43] at 4.) Because both parties submitted extensive materials outside the complaint with regard to the Eighth Amendment claim, I converted Defendants' motion into one for summary judgment. *Id.* at 3. I now grant the motion.

1 – OPINION AND ORDER

## BACKGROUND

Except where otherwise indicated, the following facts are undisputed. Most are derived from testimony at Mr. Vickers's assailant's criminal trial for assault.[1]

Mr. Vickers was an inmate at the Federal Correctional Institute at Sheridan, Oregon ("Sheridan") on November 21, 2010. On that date, as Mr. Vickers returned from a workout to his room "on the top tier," fellow inmate Spears asked him how many burpees[2] he did that day. (Mr. Vickers's Test. [29-1] at 316:9–317:6.) When Mr. Vickers answered, inmate Tommy Lee Vasquez called out that Mr. Vickers did not know how to do burpees correctly. *Id.* at 317:7–13. An argument ensued, lasting perhaps ten minutes, in which Mr. Vasquez accused Mr. Vickers of being unable to do burpees and Mr. Vickers "challenge[d] [Mr. Vasquez] to burpees." *Id.* at 317:17–318:13. Officer Jensrud overheard the altercation. (Ofc. Jensrud's Test. [34-1] at 43:1–8.) He reported to another officer that he heard Mr. Vickers saying to Mr. Vasquez, "I'm a 50-year-old man" and "[t]he old white man can whup your ass." *Id.* at 43:12–21.

After the argument, Mr. Vickers returned to his room to "calm down." (Mr. Vickers's Test. [29-1] at 318:21–319:5.) A few minutes later, he left to play cards with Mr. Spears. *Id.* at 319:6–9. By this time, he thought that "everything was over with" between him and Mr. Vasquez. *Id.* at 320:10–12. Minutes later, however, another inmate told Mr. Vickers that Mr. Vasquez was waiting for him "in the Mexican TV room." *Id.* at 320:16–17. Mr. Vickers decided to go to the TV room in order not to "look like a coward," though he did not want to fight "over something this stupid, over burpees." *Id.* at 322:5–23.

At some point after the verbal altercation but before Mr. Vickers confronted Mr. Vasquez in the TV room, Officer Jensrud left Mr. Vickers's unit for "the patio" in order to facilitate a

---

[1] Neither party objects to this testimony on hearsay grounds.
[2] According to Defendants, "[a] burpee is a full body exercise combining a squat with a push-up." (Mem. in Supp. [28] at 2 n.2.)

2 – OPINION AND ORDER

"recreation move." (Ofc. Jensrud's Test. [34-1] at 44:7–25; Mr. Vickers's Test. [29-1] at 324:19–325:20.) When he reached the patio, Officer Jensrud told Officer Michael Michaelson about the argument, but did not yet believe that it was likely to lead to a fight between Mr. Vickers and Mr. Vasquez. *Id.* at 45:1–15. A "couple of minutes later," Officer Jensrud saw Teddy Morris, Mr. Vickers's cellmate, looking at him from the top tier of Mr. Vickers's unit. *Id.* at 45:19–46:2; Ofc. Jensrud Decl. [50] at ¶ 10. Because Officer Jensrud had never seen Mr. Morris standing in that location, he began to suspect that a fight might break out. (Ofc. Jensrud's Test. [34-1] at 46:3–19.) He communicated his fear to Officer Michaelson and asked him to contact Lieutenant Kyle Van Cleave. (Ofc. Michaelson's Test. [51-4] at 40:6–11; Supp. Resp. Ex. 5 [51-5] at 1.) Officer Jensrud then reentered Mr. Vickers's unit. (Ofc. Jensrud's Test. [34-1] at 46:20–22.)

Officer Michaelson warned Lieutenant Van Cleave that a fight was likely to break out between Mr. Vickers and Mr. Vasquez. (Resp. Ex. 5 [51-5] at 1.) The lieutenant instructed Officer Michaelson "to locate the inmates and send them one at a time to his office." *Id.*; Ex. 7 [51-7] at 1. Officer Michaelson heard a "body alarm" immediately after hanging up. (Supp. Resp. Ex. 5 [51-5] at 1.)

For his part, after learning that Mr. Vasquez was waiting for him, Mr. Vickers waited for Officer Jensrud to leave the unit[3] and followed Mr. Vasquez to the TV room. (Mr. Vickers's Test. [29-1] at 324:19–325:20; Ofc. Jensrud's Test. [34-1] at 44:7–10.) Mr. Vasquez first struck Mr. Vickers in the face with a chair. (Mr. Vickers's Test. [29-1] at 326:10–11.) Mr. Vickers spoke to Mr. Vasquez to try to calm him down. *Id.* at 328:6–19. Undeterred, Mr. Vasquez

---

[3] Mr. Vickers does not name the officer whose departure he awaited. However, Defendants assert that it was Officer Jensrud, and Mr. Vickers does not challenge this assertion. (Supp. Mem. [49] at 7.)

3 – OPINION AND ORDER

"came at" Mr. Vickers, took him to the floor, and punched him. *Id.* at 329:13–330:2. As Mr. Vasquez continued to attack, Mr. Vickers lost consciousness. *Id.* at 330:3–21.

Officer Jensrud "heard a loud thump" as he approached the TV room, and entered to find Mr. Vickers lying on the floor. (Supp. Resp. Ex. 6 [51-6] at 1; Ofc. Jensrud's Test. [34-1] at 50:21–51:20.) Mr. Vasquez ran past him and fled the scene. (Supp Resp. Ex. 6 [51-6] at 1; Ofc. Jensrud's Test. [34-1] at 51:3–9.) Officer Jensrud activated his body alarm and issued a lock-down order. (Supp. Resp. Ex. 6 [51-6] at 1.)

At the time the events underlying this action occurred, Special Investigative Supervisor Lieutenant Debra Payne was responsible for monitoring prison gangs and investigating altercations between inmates. (Lt. Payne's Test. [51-4] at 107:24–108:8.) Sheridan called on her to investigate the fight between Mr. Vickers and Mr. Vasquez because it produced "significant injury" and because the participants were of different races. *Id.* at 108:11–16. Lieutenant Payne was concerned that a race-based conflict between inmates could expand into "some sort of riot." (Lt. Payne's Test. [34-2] at 13:24–14:5.) She learned from Mr. Vasquez, however, that the fight was no more than a "one-on-one issue," not the germ of a dispute between the prison's ethnic gangs. (Lt. Payne's Test. [51-4] at 115:21–116:20.) Indeed, no further troubles developed between "the white inmates" and "the Hispanic inmates." (Lt. Payne's Test. [41-1] at 266:15–24.)

Mr. Vasquez had arrived at Sheridan a little more than a month prior to his assault on Mr. Vickers. (Syed Decl. [30] at ¶ 11.) Before their argument concerning burpees, Mr. Vickers did not know Mr. Vasquez well. (Mr. Vickers's Trial Test. [29-1] at 318:16–20.) Both inmates' Bureau of Prisons records reflect no prior violent behavior. (Mr. Vickers's Disc. Rec. [30-4] at 1–5; Mr. Vasquez's Disc. Rec. [30-7] at 1–2.) Despite having worked in Mr. Vickers's unit for

4 – OPINION AND ORDER

four months, Officer Jensrud had never "witnessed any tension" between the inmates housed there before the fight. (Ofc. Jensrud's Decl. [50] at ¶¶ 3, 18.)

Mr. Vickers asserts a claim against Officer Jensrud and the twenty Doe defendants under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging a violation of the Eighth Amendment's guarantee of freedom from cruel and unusual punishment. (2d Am Comp. [23] at ¶¶ 32–40.) He alleges that Officer Jensrud's failure to prevent his fight with Mr. Vasquez showed deliberate indifference to a substantial risk of serious bodily harm. *Id.* Defendants moved to dismiss the *Bivens* claim under Rule 12(b)(6), arguing that Officer Jensrud is entitled to qualified immunity. (Mot. [27] at 1; Mem. in Supp. [28] at 4–12.) In support of the motion, they submitted extensive excerpts from testimony at Mr. Vasquez's criminal trial for assault. (*See* Wight Decl. Ex. 1 [29-1].) Mr. Vickers offered further testimony excerpts in support of his opposition to Defendants' motion. (Resp. Ex. 1 [34-1]; Ex. 2 [34-2].) Because both parties relied on materials outside the pleadings, I converted Defendants' motion to dismiss the *Bivens* claim into one for summary judgment. (Op. & Order [43] at 3.)

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the nonmoving party, drawing in his favor all reasonable inferences from the facts. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

The moving party bears the initial burden of informing the court of the basis of its motion and providing evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the nonmoving party

must "present significant probative evidence tending to support its claim or defense." *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (internal quotation omitted). The nonmoving party fails to meet its burden if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

Qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts conduct a two-step inquiry: (1) whether the facts alleged or shown make out a violation of a constitutional or statutory right; and (2) whether that right was "clearly established" when the alleged misconduct occurred. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Which of the steps to take up first is committed to the court's discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because I find that Mr. Vickers has not raised a genuine dispute of material fact as to whether Ofc. Jensrud violated any rights under the Eighth Amendment, I decline to determine whether any such right was clearly established.

Under the Eighth Amendment, prison officials "must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotation omitted). This duty includes an obligation "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal quotation omitted). Not every inmate-inflicted injury gives rise to a claim against prison officials, however. *Id.* at 834. Instead, two requirements must be met to hold a prison official liable for failure to protect an inmate: (1) "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious

harm"; and (2) the official must have harbored "deliberate indifference to inmate health or safety." *Id.* (internal quotation omitted). The "deliberate indifference" element requires a finding that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that he "also dr[e]w the inference." *Id.* at 837. The official must then disregard the risk. *Id.* Negligence and even gross negligence are insufficient. *Id.* at 835–36 & n.4. The official is not liable if he responded reasonably to a known risk, "even if the harm ultimately was not averted." *Id.* at 844.

Defendants focus on the second element. They argue that the evidence in the record does not support an inference that Officer Jensrud was aware of a substantial risk of serious harm. (Mem. in Supp. [28] at 6.) Defendants argue further that, even if Officer Jensrud had such knowledge, Mr. Vickers has not produced evidence to suggest that Officer Jensrud disregarded the risk. *Id.*

## I. Whether Officer Jensrud Was Aware That Mr. Vasquez Posed a Substantial Risk of Serious Harm to Mr. Vickers

"[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Courts "measure what is 'obvious'" based on the knowledge a reasonable prison official would have concerning the risk. *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010). The inmate need only show that "he was exposed to a substantial risk of some range of serious harms." *Lemire v. Cal. Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1076 (9th Cir. 2013). "[T]he harm he actually suffered need not have been the most likely result among the range of outcomes." *Id.*

"[T]hreats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm" to a prison official. *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996). In particular, one inmate's threat against another will not have

this effect where neither inmate has a prior history of violence. *See Perkins v. Grimes*, 161 F.3d 1127, 1130 (8th Cir. 1998) (no notice of the risk that an inmate would sexually assault another where they had previously been housed together without incident); *Lucas v. Eagleton*, No. 05-2007, 2007 WL 2457571 at *9 (D.S.C. Aug. 23, 2007) (a prison official's witnessing an argument between two inmates did not put him on notice of a risk of harm absent evidence of a propensity of violence or a "history of animosity").

Mr. Vickers argues that, even in the absence of a history of enmity between him and Mr. Vasquez, the combination of his exchange of insults and threats with Mr. Vasquez and the two inmates' different ethnicities made the risk of violence substantial. (Resp. [34] at 6.) He cites a prison official's testimony at Mr. Vasquez's criminal trial that "issues" between inmates of different races have the potential of becoming "a major issue," perhaps a riot. (Ms. Payne's Test. [34-2] at 13: 21–14:5.) After the attack, this official consulted with another Hispanic inmate to be sure that a sustained race-based conflict would not erupt. *Id.* at 28:17–22. Mr. Vickers himself testified that he would face reprisal from other inmates if he did not answer Mr. Vasquez's challenge. (Mr. Vickers's Test. [29-1] at 366:6–25.) Mr. Vickers offers these statements as evidence that the interracial nature of his argument with Mr. Vasquez made a subsequent assault substantially likely. (Resp. [34] at 7.)

Mr. Vickers goes on to argue that the risk Mr. Vasquez posed to Mr. Vickers was obvious, such that knowledge of the risk should be imputed to Officer Vasquez. First, he cites case law and academic commentary for the proposition that "prisoners of opposing races who hurl expletives at each other have no option but to hurl blows as well." *Id.* at 8–9. The Supreme Court has observed that prisons are violent places filled with impulsive, antisocial people, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and that state correctional systems routinely

segregate prisoners by race to prevent racially drawn prison gangs from attacking each other, *Johnson v. California*, 543 U.S. 499, 502–03 (2005). These gangs, "fueled by actively virulent racism," make "[p]rotecting staff from prisoners and prisoners from each other . . . a constant challenge." *Stefanow v. McFadden*, 103 F.3d 1466, 1472 (9th Cir. 1996).

The racial tension exposed in the cases and commentary existed at Sheridan, according to Mr. Vickers, making the threat of serious harm "nothing if not obvious." (Resp. [34] at 9–10.) Inmates at Sheridan organize themselves into gangs, which prison officials style "security threat groups," led by a "shot-caller." (Ms. Payne's Test. [34-2] at 24:10–15.) At least one official had a duty "to know which groups individual inmates belong to." *Id.* at 24:18–20. Mr. Vickers argues that these facts would alert a reasonable Sheridan official to the danger that an interracial argument could likely become a fight, and asserts therefore that Officer Jensrud should be deemed aware of this danger. (Resp. [34] at 9–10.)

Mr. Vickers's argument proves too much. If every verbal altercation between inmates of different races is enough categorically to create a substantial risk of serious harm, then a prison official's every failure to intervene in such an altercation, regardless of the context or the inmates' prior history of violence, would violate the Eighth Amendment. Tense as racial relations may be in our federal penitentiaries, Mr. Vickers has not presented evidence to suggest that interracial insults and threats lead so inevitably to violence that such a sweeping conclusion is warranted. To hold that all such threats put prison officials on notice of a substantial risk of serious harm would also impose an unrealistic burden on prison administrators.

Accordingly, I hold to the contrary that some evidence of imminent violence particular to one or more of the inmates involved is necessary. That evidence is absent here. That Officer Jensrud did not know of any prior animus between Mr. Vickers and Mr. Vasquez, or among any

9 – OPINION AND ORDER

of the inmates in Mr. Vickers's unit, is uncontroverted. Merely that Mr. Vickers and Mr. Vasquez had an argument while belonging to different races is insufficient to alert Officer Jensrud to a substantial risk of serious harm.

## II.     Whether Officer Jensrud Deliberately Disregarded Any Risk to Mr. Vickers

Prison officials who become aware of a substantial risk of serious harm to an inmate "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Brennan*, 511 U.S. at 844. The reasonableness of an official's conduct is measured according to "the penological circumstances in light of the severity of the risk to which the inmates are exposed." *Lemire*, 726 F.3d at 1079.

Even if Officer Jensrud knew of an unacceptable risk of harm to Mr. Vickers, Defendants argue, he did not disregard it but acted reasonably. (Supp. Reply [54] at 5.) They observe that uncontroverted evidence establishes that Officer Jensrud directed Officer Michaelson to contact Lieutenant Van Cleave as soon as he suspected that a fight would break out. *Id.* at 5. Officer Jensrud then returned to the unit to see what was happening on the top tier. *Id.* The only reason he was unable to stop the fight, Defendants argue, is that the inmates deliberately waited to begin it until he left the unit. *Id.*

Mr. Vickers argues to the contrary that Officer Jensrud's response to the impending fight was unreasonable. (Supp. Resp. [51] at 15–16.) This argument rests on a misapprehension of the uncontroverted evidence in the record. Mr. Vickers asserts that Officer Jensrud stepped out of the unit onto the patio *after* Lieutenant Van Cleave directed that each inmate be brought to him separately. *Id.* Mr. Vickers accuses Officer Jensrud of "ignor[ing]" the lieutenant's order, and, with it, the danger to Mr. Vickers's safety. *Id.* However, as Defendants point out, the record sets forth in multiple places, including Mr. Vickers's own complaint, that Officer Jensrud

had *already* left the unit when he alerted Officer Michaelson to the danger of a fight. (Supp. Reply [54] at 2–5 (citing Am. Compl. [18] at 5–6;[4] Supp. Resp. Ex. 5 [51-5] at 1).) Defendants argue that this evidence establishes that "Officer Jensrud did exactly what [Mr. Vickers] asserts he should have done—he sought help and returned to the unit." *Id.* at 5 (emphasis omitted).

Defendants are correct. Uncontroverted evidence reveals that Officer Jensrud directed Officer Michaelson to warn Lieutenant Van Cleave as soon as he suspected that a fight would break out, and then returned to the unit to investigate. Even if the evidence permitted an inference that Officer Jensrud was aware of a substantial risk of serious harm to Mr. Vickers, the record demonstrates that he attended to his duty to prevent that harm.

### III.     Mr. Vickers's Voluntary Confrontation with Mr. Vasquez

An official is not liable in damages for an Eighth Amendment violation unless his deliberate indifference was a proximate cause of the inmate's injuries. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). If the inmate voluntarily encountered the source of the risk of harm, then his own conduct is a superseding cause of the injuries absolving the allegedly indifferent officer of liability. *See Wilson v. Archer*, No. 12-1082, 2014 WL 37788, at *3 (D. Or. Jan. 4, 2014) (holding that the plaintiff inmate's conduct was a superseding cause of his injuries where he voluntarily joined a fight among numerous inmates despite an opportunity to stand aside); *Garces v. Degadeo*, No. 06-1038, 2010 WL 796831, at *4 (E.D. Cal. Mar. 5, 2010) (holding that defendants' conduct was not a proximate cause of an inmate's injuries where the inmate voluntarily fought with his cellmate).

Here, according to uncontroverted evidence, Mr. Vickers voluntarily confronted Mr. Vasquez in the TV room rather than continue to play cards with Mr. Spears. Not only did he

---

[4] The operative pleading is Mr. Vickers's Second Amended Complaint [23], which sets forth that Officer Jensrud reported the danger of an assault after leaving the cell block at paragraph 24.

11 – OPINION AND ORDER

forgo a chance to avoid the fight, he also waited until Officer Jensrud left the unit to do so, ensuring that no immediate help would be available. Mr. Vickers's decision to encounter the risk of a fight voluntarily supersedes any liability that Officer Jensrud might bear for his injuries.

## CONCLUSION

Mr. Vickers has failed to raise a genuine dispute of material fact as to whether Officer Jensrud knew of a substantial risk of serious harm and as to whether he failed to respond reasonably to such a risk. In addition, Mr. Vickers does not dispute that he encountered any such risk voluntarily. As the Doe defendants are concerned, Mr. Vickers has not argued that any Sheridan official aside from Officer Jensrud displayed deliberate indifference. Defendants' motion for summary judgment on Mr. Vickers's *Bivens* claim is GRANTED.

IT IS SO ORDERED.

DATED this   9th   day of June, 2014.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge